I'd like to focus on two issues in the case, and if I get a chance to get to a third. The first two issues that I really want to focus on are what I'm going to call the occurrence issue, which is our main issue on appeal that there was no accident that triggered the insurance coverage for Hudson. And then the second point I want to focus on is what I'll call the other insurance issue or the excess policy issue. That's the subject of Westchester's cross appeal, and that's the argument that Hudson should be entitled to pay or required to pay the entire $4 million excess policy. And then if I have time, I'll get to a third issue, which I'll call the exhaustion issue, which is the district court's error in not putting Westchester to the burden of showing that it had gone through all the policies to determine they had been exhausted before holding Hudson liable. On the first issue, there was no occurrence in this case that would be sufficient to trigger Hudson's policy. An occurrence using well-settled language requires there to be an accident, a quote-unquote accident. Under Mississippi law, which governs here, it is well settled that an intentional act cannot trigger an accident if it has unintended consequences or negligent consequences. Why is everybody evaluating occurrence from the perspective of EMJ, which is the third party? Why are you not evaluating it from the perspective of the named insured on the policy? Well, the general rule is that you apply it from the name of the insured who is invoking the policy. If you did it from Contract Steele's perspective, we would have been about out of this case a long time ago because no one has determined that Contract Steele did anything wrong. So the question under the way the policies were formulated – So you're assuming the conclusion in determining whether there's an occurrence. You're assuming coverage. No, we are assuming coverage. For purposes of this argument, Judge Jones, we're not disputing that there was a requirement by Contract Steele in its dealings with EMJ to have primary and excess policy coverage. But the key point is that there was no accident because all of the key events by EMJ were intentional acts. Mr. Hartline deliberately accepted the ladder. He deliberately accepted it at the wrong angle. He deliberately accepted it without the non-slip surface to be added to the rungs. Those are all deliberate acts, and under well-settled Mississippi law, those cannot constitute an accident, which is strictly an inadvertent act. I can walk you through the Mississippi cases, but we've cited them in our brief. The key ones are Architects and Moulton, and then this court certified – We've read Allard, and we've read Moulton, and we've read OmniBank, and we've read Architects, and even what the Mississippi court says in its internal conversation about what those cases mean. Whether it's – no, it was not unintended that the lady filed a lawsuit against the Goss, and he stole, and then he filed a malicious prosecution, and all of that. And then we get to the brother-in-law shooting, and it wasn't unintentional. It wasn't accidental. He got the gun, and then he shot him, but then they said, well, but the shooting occurred at his foot, and there was the splatter about the bullets, and so, you know, not unintended. And then they get – OmniBank certifies to our court, and the majority says those two cases can be harmonized. The dissent says no, pick one. Then we get later – I forget the name – ACC, I guess, the case in which we try to reconcile it. So I'm saying all that to say you say the law is clear and well settled, and I'm just for the moment challenging the notion, at least for me, that it's all that clear. It seems to be a point at what point in the temporal spectrum you start looking at sort of intentionality, i.e., you know, nobody – so, I mean, that's the troublesome part I have with the analysis. Well, Chief Judge Stewart, thank you for saving me a lot of time going through the Mississippi cases. There's actually an opinion that you wrote for this court in 2003 called ACS, which we've cited on page 37 of our brief. Well, obviously that didn't help me. Well, here is why I think that is helpful. If you were to assume the hypothetical that EMJ's Mr. Hartline had not done anything with respect to the latter, there were no intentional acts, but Mr. Meeker simply fell at the site or had an accident, that would be a true accident. There was inadvertence on the part of EMJ. I think that we could accept that. Where this case becomes different is that EMJ's actions were intentional. They intentionally accepted a latter that was improperly angled and that didn't have the appropriate safety features. Those as deliberate acts cannot be an accident under Mississippi law because they had advertense to it. They were not inadvertent. The reason why this is important for the insurance world is that insurers do not insure against intentional acts. They can't do that because there's a moral hazard. But at the bottom of every negligence case is something that happened intentionally. So this seems to me like a fact-specific inquiry, and it seems to me like something where EMJ did something that was negligent. You can call it intentional. Well, of course. Well, suppose it had been a painter had splashed some paint and EMJ's guy walked by and he didn't see the paint on the run. Would that have been intentional, too? Well, I think under Mississippi law, those cases probably would not lead to excess coverage. And this is the key point. When you have excess coverage, you've already got primary layers that are dealing with these. And what you're really talking about are the catastrophic… But they all turn on the occurrence definition, don't they? Both primary and excess. They do, Judge Jones. But the key point, I think, for our purposes is whether or not you can trace to intentional acts. And if you can, then the courts in Mississippi have held that you're not going to find an accident. And this court has accepted that kind of rationale in the cases that we've cited. Assuming the answer almost, you say if you have an intentional act. Well, under the restatement and everywhere else in the world, I believe, an intentional act is an act in which you either desire or you know the consequences of your act to a substantial certainty. Judge Jones. If it's short of that, it's negligence. The question, though, I think, is whether or not your intentional act leads to unintended consequences. And where the line is drawn, as I understand it, between an accident and unintended consequences is this concept of inadvertence. And that's why if you were to imagine the situation where EMJ had not done anything here but Mr. Meeker had still fallen, we would acknowledge that was an accident. But where EMG's intervening act, EMJ's intervening acts are intentional, that's where the Mississippi courts have taken that out of the realm of an accident. Well, you're trying to conflate occurrence and premises liability. Are you trying to say that you're sort of arguing a premises liability situation, that only premises liability will suffice? Well, Judge Jones, I don't think I need to go there. If we just focus on the Mississippi cases and this court's cases, I think that you'll accept the line and this court has accepted the line. I pointed out to the ACS case, the National Builders and Construction Insurance case at 428 Fed Appendix also covers this point. But I think that the main thing is if you focus on this line, then you would come to the conclusion that the district court had erred in holding that an occurrence had come on this line. If I could go to the second issue now. All right. Well, before you do, just for me. Okay. We get to architects or architects. So what do you – I mean the argument made from the other side is architects is the best case or the closest, I will say, to the scenario we said. So before you just shift gears, tell me what's your take on that? All architects involved was the hiring of a subcontractor and then every other responsibility was given to the subcontractor. And what the Mississippi Supreme Court held in that case was that the mere hiring of somebody for whom you gave full responsibility for all of its acts did not lead to an accident being determined for the hiring contractor. And so for that reason, it's a distinguishable case. Now, if I could go to the cross-appeal issue in my remaining primary time, the general rule is that when excess policies conflict, they are deemed to be mutually repugnant and then courts will trigger policies on a pro rata basis according to their policy limits. That's exactly the situation that we have here. They're both described as excess policies. If you read them carefully, the policies will make clear that they are actually – one would deem to be excess to the other. And there's where the mutual repugnance – The two things that spring immediately to mind that they say – you're leaving out the principle that it is up to the court to carefully interpret both policies because sometimes one is not as clearly excess as the other one is. Isn't that a correct statement? I would say that generally you, of course, with any insurance contract, apply contract interpretation principles. But I would go further to say, Judge Jones, that the Mississippi Supreme Court in the Travelers Insurance v. Chappelle case has held that we don't want to get too far into the weeds precisely because we don't want there to be a race to the bottom by insurance companies that lead to policies that cancel out and don't provide insurance. Well, of course not. That's just a response to the argument that neither one is excess. But, you know, arguing, well, I'm not excess at all and better that you have pro rata coverage. I mean, in other words, that proves too much. But what is your response to their argument that, A, your retained limit definition was – I think the retained limit was the one that referred only to other primary coverage. And then, B, you did not have a limit that said we will not contribute. In fact, to the contrary, you said that you would go pro rata with other excess policies. So on the retained limit, they waived that because they didn't raise it in the district court. And in any event, it's not relevant because the proper clause to determine which insurance is going to apply as between two insurance policies is the other insurance clause. And that's the one that we have principally been debating. The retained limit really talks about when insurance gets triggered. And on the other point, the question that you've raised about the shall not contribute, the main case they cite is a New York case called Lamarro. But that case is distinguishable because it actually did concern two policies that were different. One was an actual contribution policy and the other was an excess policy. Here you have what are self-described excess policies. The Hudson policy makes very clear it is excess used to every other kind of insurance policy that could be done except for the one exception is where there is an excess policy that specifically enumerates or names the Hudson policy. Well, it doesn't say specifically enumerates, right? No, but this court has construed that language to mean that there is a specific enumeration. That's the Travelers-Lloyds case, I believe. And what this court has said is that you want to have these kinds of policies done in this form where there's a pro rata sharing. And the word share that is used in this specific context, Your Honor, is done as – and if you were reading it in the line of how the tower of insurance works, we know that there will be other insurers that are providing money to cover the insured. And so the natural way you would understand share in the context of that provision is with the other primary insurers, if there is a part that's above that, we cover that. Our share will be that part that is excess within our policy limits. That's the natural way you would understand that language. And the words that they invoke, the shall not contribute, is simply another way of saying that it is only an excess policy. I don't think it gives you added juice, if you will, to the argument. And that's why the district court was correct in its ruling, post-trial ruling, that these policies, in effect, cancel out. The Texas Supreme Court explained in the hardware dealer's case the reason why you have that principle, and it's because you don't want to have insurance companies in their excess policies getting so granulated and reticulated that there is a conflict where it's pretty obvious that what you're talking about here are two excess policies. I'll save the remainder of my time for rebuttal unless you have further questions at this time. All right. Thank you, Mr. Frederick. You have rebuttal time. Mr. Hacker? Good morning, Your Honors, and may it please the court. If I may, I will address the arguments in the reverse order from how Mr. Frederick addressed them and begin with our cross-appeal issue, which I refer to as a priority of coverage issue. And under Mississippi law, insurance policies are deemed repugnant and therefore contribute pro rata only when they are, quote, indistinguishable in meaning and intent. The best statement of that is from the guidance case of the Mississippi Supreme Court. Contract Steel purchased the Hudson policy at issue here and made EMJ an additional insurer on that policy for only one reason. Contract Steel was required by its subcontract with EMJ to purchase primary insurance for EMJ. Yeah, yeah, yeah. And so in effect what's happening here is that CSC is indemnifying EMJ for EMJ's negligence. Is that right? Well, the agreement, as it played out in the underlying case, EMJ was charged with negligence, but that's perfectly consistent with the policy with the subcontract. I understand that, but normally there are rules about that because there's a theory that the subcontractor has less bargaining power than the general or the owner and that, you know, it has to be precise and that. So that just didn't come up in this case? It didn't come up. We haven't heard that argument. It wouldn't be meritorious, Judge, because it is absolutely settled. There's cases from this court and others which haven't been briefed that say a subcontractor can have this kind of provision where you provide indemnification or are required to purchase insurance. Not indemnification. That's a relevant distinction. Provide insurance for an injury that arises from your work regardless of which party is negligent or responsible for it. That's the key distinction. We're not talking about indemnification. We're talking about contractual express obligation to purchase insurance that was in the written contract required to be primary insurance. There is absolutely no ambiguity about that expressed intent. And under those circumstances, that policy should and must be deemed the primary policy it was intended to be. That intent, of course, is consistently confirmed by every comparable provision in the two policies. When you look at each provision that's at issue, without fail, without exception, in every potentially competing provision, the Westchester provision evinces an intent to follow the Hudson policy to come after the Hudson policy in coverage priority. So the sole question under Mississippi law, which I believe is accepted here, it's common ground here, is whether the policies can be reconciled. If they can be, they must be. That's, again, the principle as stated in the Guidant case is that there's contribution only where the policies are, quote, indistinguishable, end meeting, and intent. So the first point is that EMJ, this contract seal is required to purchase the Hudson policy pursuant to its duty to buy primary insurance for EMJ. That limitation is actually incorporated directly into the Hudson policy with respect to priority for EMJ's coverage under this course of action. Now, you're going too fast here, because did EMJ have the right to review the Hudson policy before the contract came into effect? I don't know whether EMJ had a right to, but that's because contract seal was required to and, in fact, did certify. The certification says to EMJ, this is the primary insurance that we purchased for you. I thought that was the, you don't, your client does not defend on appeal the district court using primarily the subcontract to decide that both of them, how they should be interpreted. We do. But it's the last argument at the end of the brief. I understand. There's different ways to approach it. Well, I don't think that's the proper way. The proper way, because they might have reached their contract if, in fact, Hudson was a excess coverage. And besides which, you're both excess coverage. We're both umbrella coverage, but that doesn't, that only raises the question, doesn't answer who comes first. And under this court's iron short case, which we do cite, we do rely on, and do say explicitly incorporates, because the only reason EMJ has coverage as an additional insured is the requirement in the subcontract to provide the written requirement to provide primary insurance. And in iron short, this court did exactly that analysis following the Deepwater Horizon case to say that when there is the written contract that requires an additional insured, coverage for an additional insured. Is that the Deepwater Horizon case that was certified to the Texas Supreme Court? Yes. And then the Texas Supreme Court answered that question and said the limits, this isn't a limit question, but the analysis is absolutely on all fours. The court said the limits, even though the actual coverage provided, provided for I think 10 and 40 million, much larger limits, this court, the Texas Supreme Court in Deepwater Horizon, said that the limits were actually lower, incorporated the limits that were stated in the requirement for the subcontractor, that the limits should be based on what liabilities the subcontractor assumed, and that the limits, therefore, were lower than what the actual policy provided. The analysis here is exactly the same. Because the contract steal was required to get primary insurance, that requirement, at least vis-a-vis EMJ, is incorporated into the terms of the policy. And even if you don't go, Your Honor, as far as Ironshore and Deepwater Horizon and say it's literally incorporated as a matter of law, it still tells you unambiguously what both EMJ and contract steal's intent was with respect to this policy. There isn't any question about it. We know that both of those parties, the insured parties, wanted this insurance to be primary as against other EMJ insurance. This case is easily resolved for that reason alone, unlike in many other cases where you do have the task of reconciling provisions. You don't even need to get to that, because here the intent is not disputed. But again, the provisions, when you do look at them, also confirm that intent. The first one I would point to is one I don't think Mr. Frederick mentioned, which is the Condition H of the Westchester policy, which states that the Westchester policy is excess unless another policy is, quote, purchased specifically and, this is the key point, and is so specified in such insurance policy to apply in excess of this policy. So EMJ, by obtaining that provision in its insurance, made clear that this policy, the Westchester policy, would be excess except in one circumstance. There's only one situation in which EMJ said another policy would ever be excess to the Westchester policy, and that's if EMJ went and got other insurance and specifically said, in the text of that policy, that it was excess to the Westchester policy. That was the provision that EMJ negotiated and obtained in the Westchester policy, and it doesn't exist in the policy that Contract Steele obtained, again pursuant to its obligation to obtain primary insurance. Another provision is Condition H also explicitly says there will not be contribution, not ever. Under no circumstances will there be contribution. Again, the Hudson policy does not have that provision. That alone, that comparison alone is sufficient to establish that the Westchester policy on its face is different from and secondary to, higher in the coverage tower than the Hudson policy. So that's all we need to establish, but the Hudson policy does go further and use the phrase, our share contemplates a sharing in some circumstances, admittedly unspecified, but it uses the phrase our share. Yes, and so you're saying that the only circumstances where you would have contribution would be if the Hudson policy also said no contribution. If the Hudson policy also says no contribution, then you would have repugnant clauses. We'd still have the fundamental difference of the intent based on the subcontractor, but then those clauses at least would be repugnant if the Hudson clause said no contribution. Not only does the Hudson clause not say no contribution, it also says our share, which if you look in the Mississippi Supreme Court's guidance case, cites a policy, recites a policy provision that uses our share to define a pro rata provision. Now, I don't have to establish that our share suffices to establish that this is a pro rata policy, but it's certainly by comparison to the provisions, the language used in the Westchester policy, there isn't any doubt that the Westchester policy evinces a superior intent to be higher in the coverage tower than the Hudson policy. The final provision I would point to is the retained limit provision that simply says the Westchester, the two provisions, Westchester policy says it will apply after, quote, any other insurance, and the Hudson policy says it will apply after, quote, any collectible, excuse me, other collectible primary insurance. Again, if that were the only difference, would I be here? Would I have a strong argument that the two can be reconciled? Maybe not, but again, every time you look at comparable provisions without fail, without exception, the Westchester policy's language evinces an intent to be a secondary higher level policy. If there are no further questions on the priority of coverage issue, I'll turn to what Mr. Frederick argued was their primary argument and their appeal, and that's the occurrence issue, which I think is easily addressed. Mr. Meeker's injury was accidental by any usage of that word in the English language. He fell off the ladder. He wasn't pushed. He didn't jump. It was an accident. Their argument relies on cases, a misunderstanding of Mississippi cases that say that for certain intentional acts, the fact that you didn't intend an injury doesn't mean your act is any less intentional. The proper analogy would be in this case, for example, if Mr. Hartline had stuck his foot out and tripped Mr. Meeker, but didn't intend, and it was undisputed that he didn't intend to cause injury. He's an old college buddy playing a joke on him, and he falls and becomes a paraplegic. That's the kind of situation where the act is intentional, and that intentional act itself was the immediate cause of the injury, but the fact that you say I didn't intend to cause the injury doesn't make it a covered act of negligence. This is a completely different situation. What you have is an admittedly knowing act back in the chain of causation where Mr. Hartline accepted a ladder that he understood was too short, but he didn't intend by doing that to cause any injury. He didn't intend to cause any accident. Everything that happened was a chain of causation that led to the unexpected act of somebody falling off the ladder in circumstances that Mr. Hartline or EMJ did not control. Now, that doesn't mean they're not liable as a matter of tort law. That establishes the fact that Mr. Hartline and EMJ, if not knew, should have known that accepting the ladder, knowingly accepting the ladder, could lead to a greater risk that would cause the unexpected injury that eventually occurred. The architect's case that Chief Judge Stewart referred to, I think, is on point here because there, in that situation, in that case, the subcontractor, the contractor, knowingly, intentionally hired a particular subcontractor. That was an intentional act. And then the subcontractor later screwed up, and the roofing tile fell on the passerby. The fact that there was an intentional knowing act back in the chain of causation doesn't mean that the contractor in that situation intended and controlled the chain of events that led to that ultimate injury. If in these circumstances, Your Honors, if in these circumstances, if there's any— let me put it this way. If there's any doubt, if Chief Judge Stewart, when you read the cases, and you think it's a little bit hard to tell the precise principles here, I think the Court can easily fall back on the settled principle that you construe a policy, including a word like occurrence, in favor of the insured, in this case EMJ, and against the insured that's trying to duck out of its liability in circumstances that would clearly lead to coverage in any jurisdiction in this country, Mississippi included. Frankly, I have to say, Your Honors, that the argument Hudson, the insurance company, and now I'm representing both EMJ and Westchester, the argument they're making here that this was not an accident I think is the kind of argument that gives insurance companies a bad name. You have one insurance company here, Westchester, who accepted its responsibility, accepted liability, agreed to pay because recognizing that this was an accident for which insurance there is commercial general liability occurrence-based coverage. You have another insurance company that is making every argument it can come up with, whether supported by the facts or case law or not, to try to evade the responsibility. I think in this case, again, if there's any doubt about where the case law gets you as to where the precise line is between a knowing act back in the chain of causation, you can screw the policy against the insurance company and say that this was an occurrence like it would be in any other jurisdiction. You employ that same rule when you're not talking about the rights of the insured but the rights as between two excess carriers. I'm not invoking it for the proposition on priority of coverage. I'm not sure it would apply there. It's difficult for me to see how, although I would say that you could look to the intent of the insured here, EMJ. You certainly would defer to their intent and its intention to direct Project Steele. I'm just asking you why we apply that thumb on the scale when we know that EMJ is covered here. Well, you apply the thumb on the scale with respect to occurrence because the argument here is that the insurance policy doesn't apply, that there's no coverage at all. It would apply equally to Westchester. Westchester simply didn't make the argument because it's a ludicrous argument to say that this was not an accident. So Westchester has not advanced it, but the principle still applies to say that— Ludicrous for EMJ's lawyer to say that Hudson was excess here. Didn't Westchester try to get Hudson to defend the case originally? Yes. Or EMJ did? Absolutely. EMJ tried to get somebody to defend it. One of their arguments, I think, is that EMJ's counsel decided that Westchester had an excess policy and that it was on the same level as the Westchester policy. I'm not sure that's an argument they're advancing here. Whatever EMJ's counsel's arguments were, from EMJ's perspective— From their testimony, the EMJ's lawyer testified. I don't doubt, from EMJ's perspective, it's got coverage on two policies that are deemed umbrella and it's saying somebody needs to cover. There's no question that EMJ would argue that because EMJ's right about that. There's commercial general liability coverage as between the insurance companies as to which one where the priority of coverage lies. And the point simply with respect to deference to the insurance intent is to say that you can and should defer to EMJ's intent and Contract Steele's when it directed Contract Steele in the policy to purchase primary insurance. I think that's a fair point where the canon of favoring the insured over the insurer applies. But I'm really invoking it here for the proposition that if there's doubt about what an occurrence means, if there's doubt about where the case law draws the line in terms of a knowing act back in the chain of causation, the court should apply that canon and say that we would construe occurrence against Hudson and in favor of coverage to say that this clearly accidental act, this accidental occurrence, is covered by the standard terms of this commercial general liability insurance policy. If there are any further questions? If there are no further questions? All right. I'll cede the balance of my time. Thank you very much. Mr. Frederick, you have a bottle if you need it? Thank you. If I could just go to the Certificate of Liability Insurance. It's very clear this is Record on Appeal 55. It's the Certificate of Insurance that says that Hudson's is clearly excess occurrence. So as CS was negotiating with EMJ and Hudson was not part of that negotiation, CS was representing to Hudson that this was an excess policy. That is verified by the plain terms of the Hudson policy, which are at 79 to 80 of the appellant's record excerpts. And if I could just read, as this insurance is, quote, excess over any other insurance, whether primary, excess, contingent, or on any other basis, it's pretty clear that the intent for Hudson was to have an insurance in excess policy. I note that the more granular arguments that counsel addressed, we've addressed in our brief and I've addressed in answer to Judge Jones's questions. But there really is clearly an effort here to have the subcontractor indemnify the primary contractor for the primary contractor's negligence. And I would note that Westchester's premium for its $25 million excess policy was $210,000. The premium for Hudson was $15,000, a 14 times disparity in the economic value that is being ascribed here. So to the extent that these are insurance companies that are seeking to argue for moral superiority here, I think that if you looked at the economics of this deal, what was going on for Hudson was clearly a very low dollar excess policy in which it was really insuring against a completely inadvertent accident. It was not intending to insure or to provide insurance for the intentional acts. And my friend concedes that it was the EMJ's Mr. Hartline who committed all of the relevant acts here, but he relies on the architect's case, and there all of the negligence was done by the subcontractor. Here all of the negligence was done by the primary contractor, and that distinction is important because the Mississippi cases say that the insured is the one whose acts you look at. He says, of course, there was an accident here because Mr. Meeker wasn't pushed or anything else off the ladder. I'll bet you Zurich's policy said it would cover an occurrence, right? I beg your pardon? Every comprehensive general policy. No, that's right, and Westchester says too. They all cover occurrences, right? So whether they're primary or excess, occurrence is occurrence, and if you have accidents on the job site, those are normally an occurrence. If they follow the law, Judge Jones. Tell me some cases where you have employees or visitors to the job site getting injured where they're not occurrences. Well, I would say that the ACS case was a subcontractor case, and in that situation this court held that there was no accident there because there wasn't an intent. There wasn't an intentional act. Now, if I could just take the remainder of my time to talk about the cross-appeal issue, Ironshore was a case about limiting the coverage of insurance, not expanding it. Westchester's argument here is to expand the coverage that Hudson is obliged to make. Hudson was not the primary insurer by the plain terms of its own certificate of liability, of excess liability, and the argument that Westchester is making here runs headlong into the reasons why when there are mutually repugnant excess policies, you don't go into the kinds of contractual interpretation arguments that ultimately fail, but the idea behind them is that you don't want to have insurance companies that are just writing in such restrictive provisions where they are both on their face to be excess policies because that yields a very unfavorable public policy result. I would submit that under Mississippi law, which are the cases we've cited, although it seems counterintuitive, Mr. Meeker's fall was not an accident because the focus should be on EMJ's actions and not on the victim, and that if you apply the normal rules of construction for excess policies, the district court did correctly opine that these were both excess policies and they would cancel each other out and therefore apply the general rule for prorate distribution. Thank you, Your Honors. Thank you, Mr. Frederick. Thank you, Mr. Hacker. I appreciate the briefing and argument. Before we call the third case, the panel will stand in a very short recess.